IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FARM BUREAU PROPERTY & CASUALTY
INSURANCE COMPANY,

       Plaintiff,

v.                                     Civ. No. 22-501 KK/JFR

ANDRAS SZANTHO, as Personal Representative
of the Wrongful Death Estate of Johnny Newnum,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff's Motion for Summary Judgment on its Complaint for Declaratory Judgment Relief (Doc. 52) ("Motion"), filed April 5, 2024. The Court, having reviewed the parties' submissions, the record, and the relevant law, and being otherwise sufficiently advised, FINDS that the Motion is well-taken and should be GRANTED.

## I.  Background

This case arises out of a tragic accident in August 2020 that fatally injured Johnny Newnum. In May 2021, Defendant Andras Szantho filed a wrongful death action in state court on behalf of Mr. Newnum's wrongful death estate. (Doc. 1-2.) In that action, Defendant asserted state tort claims against Osvaldo Esparza, Mr. Esparza's sole proprietorship OE Trucking d/b/a OE & Company ("OE"), and others. (*Id.*) Plaintiff Farm Bureau Property & Casualty Insurance Company issued an insurance policy to Mr. Esparza and OE that was in effect at the time of the accident that killed Mr. Newnum. (Doc. 1-1.) Plaintiff defended Mr. Esparza and OE in Defendant's wrongful death action under a reservation of rights. (Doc. 52 at 3; Doc. 54 at 3.)

On July 7, 2022, Plaintiff filed this action against Mr. Esparza, OE, and Defendant, asking the Court to declare that Plaintiff has no duty to defend Mr. Esparza or OE in the wrongful death

action, and no duty to indemnify Mr. Esparza, OE, or Defendant for the claims asserted therein. (Doc. 1 at 10.) The parties subsequently settled the wrongful death action and agreed to dismiss Mr. Esparza and OE from both that action and the case at bar, rendering the issue of Plaintiff's duty to defend moot. (Docs. 29, 33; Doc. 52 at 3 & n.1.) As such, the sole remaining issue in this case is whether Plaintiff has a duty to indemnify Mr. Esparza, OE, or Defendant for any claims asserted in Defendant's wrongful death action. (Doc. 52 at 3.) On April 5, 2024, Plaintiff filed the Motion presently before the Court, arguing that it is entitled to a summary judgment declaring that it owes no such duty. (*Id.* at 1, 22.)

## II. <u>Analysis</u>

### A.    Legal Standards Governing Summary Judgment

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation marks omitted); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw "unreasonable inferences that are unsupported by the record." *Est. of Redd ex rel. Redd v. Love*, 848 F.3d 899,

906 (10th Cir. 2017); *Wellington v. Daza*, 2022 WL 3041100, at *2 (10th Cir. Aug. 2, 2022), *cert. denied*, 143 S. Ct. 788 (2023).

A summary judgment movant bears the initial burden of showing the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the nonmovant would bear the burden of proof at trial, the movant may meet its initial summary judgment burden by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). But when the movant would bear the burden of proof at trial, its initial summary judgment burden is "intensified," and it must establish all of the essential elements of its claim or defense as a matter of law. *Donner v. Nicklaus*, 778 F.3d 857, 876 (10th Cir. 2015). If the movant meets its initial summary judgment burden, "the burden then shifts to the nonmovant," *Tesone*, 942 F.3d at 994, who must "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant … by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (quotation marks omitted).

**B.    Material Facts**

The following facts are undisputed for purposes of the present Motion, except as specifically noted. Plaintiff issued a commercial package insurance policy ("Policy") to Mr. Esparza doing business as "OE & Co.," that was in effect between June 2020 and June 2021. (Doc. 1-1 at 1-2; Doc. 52 at 5; Doc. 54 at 3.) The Policy has a commercial auto component ("Auto Component") and a commercial general liability component ("CGL Component"). (Doc. 1-1.)

The Policy's Auto Component provides coverage for an insured's liability for bodily injury or property damage "caused by an accident and resulting from the ownership, maintenance or use of a covered auto." (*Id.* at 7 (quotation marks omitted).) It also provides coverage for medical and funeral expenses for anyone accidentally injured while occupying a covered auto.[1] (*Id.* at 8.) The Auto Component lists three scheduled vehicles: a 1995 Red River Belly Dump trailer, a 2004 Peterbilt 387 tractor, and a 1988 Kenworth T600A tractor. (*Id.* at 4; Doc. 52-1[2] at 2.) With limited exceptions, the Auto Component provides that only the listed scheduled vehicles are "covered auto[s]." (Doc. 1-1 at 3-4, 6-7.) In his response to Plaintiff's Motion, Defendant does not argue or present any evidence to show that any exceptions apply in this case.[3] (*See generally* Doc. 54.)

The Policy's CGL Component provides "Bodily Injury and Property Damage Liability" coverage for "those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies." (*Id.* at 9 (quotation marks omitted).) This portion of the CGL Component excludes coverage for, among other things, "[b]odily injury or property damage arising out of the ownership, maintenance, use or entrustment

---

[1] The medical payments portion of the Auto Component also provides coverage for named insureds and their family members who are injured in an accident while occupying, or when struck by, "any auto." (Doc. 1-1 at 8 (quotation marks omitted).) However, there is no allegation, argument, or evidence in the record that Mr. Newnum was a named insured, or a family member of a named insured, under the Policy. (*See generally* Docs. 1, 52, 54, 57.)

[2] When the exhibits attached to Plaintiff's Motion are viewed electronically on the Court's docket, highlighting obscures some of the underlying text, but when the exhibits are printed out, no text is obscured in this way. (*See* Docs. 52-1, 52-2.) Fully legible electronic copies of the exhibits are available as Docket Nos. 59 and 59-1, respectively. Nevertheless, the Court has elected to cite to the exhibits attached to the Motion in order to align its citations with the citations in the parties' summary judgment briefing.

[3] For example, the Auto Component also includes within the definition of a covered auto an auto owned by another that an insured uses with permission as a temporary substitute for a covered auto that is being repaired. (Doc. 1-1 at 7.) But in his response to Plaintiff's Motion, Defendant does not argue that this kind of exceptionally covered auto was involved in Mr. Newnum's death. (*See generally* Doc. 54.)

to others of any … auto … owned … by … any insured."[4] (*Id.* at 10-11 (quotation marks omitted).) This exclusion specifies that "[u]se includes operation and loading or unloading," and states that

> [t]his exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the occurrence which caused the bodily injury or property damage involved the ownership, maintenance, use or entrustment to others of any … auto … that is owned … by … any insured.

(*Id.* at 11 (quotation marks omitted).)

The CGL Component also includes "Medical Payments" coverage for medical and funeral expenses incurred as a result of "bodily injury caused by an accident … [b]ecause of [an insured's] operations." (*Id.* at 12 (quotation marks omitted).) This portion of the Policy excludes expenses incurred as a result of bodily injury to a "[h]ired [p]erson," *i.e.*, "a person hired to do work for or on behalf of any insured or a tenant of any insured." (*Id.*) It also incorporates the exclusions listed in the liability portion of the CGL Component. (*Id.*)

An endorsement applicable to both the Auto Component and the CGL Component states that "[t]his insurance does not apply to liability for punitive or exemplary damages." (*Id.* at 13.)

On May 18, 2021, Defendant filed a lawsuit in state court against Mr. Esparza, OE, and others, seeking to recover damages on behalf of Mr. Newnum's wrongful death estate. (Doc. 1-2; Doc. 52 at 9; Doc. 54 at 3.) In relevant part, Defendant's original wrongful death complaint included the following allegations.[5]

---

[4] This provision does not purport to apply to the Policy's Auto Component or to otherwise negate that component's coverage for an insured's liability arising out of the ownership, maintenance, or use of a covered auto. (*See generally* Doc. 1-1.)

[5] The Court takes judicial notice that, on March 7, 2023, Defendant filed an amended complaint in the wrongful death action. *Szantho v. OE Trucking*, D-101-CV-2021-01136, First Amended Complaint for Wrongful Death (1st Jud. Dist. Ct., N.M., filed Mar. 7, 2023); *see* Fed. R. Evid. 201(b) (courts "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). With four exceptions noted below, the original and amended complaints include the same pertinent factual allegations.

The New Mexico Department of Transportation ("NMDOT") contracted with Mountain State Constructors, Inc. ("MSCI") to work on a project to improve U.S. Route 64 between Farmington and Bloomfield, New Mexico. (Doc. 1-2 at 3.) MSCI recruited OE to deliver paving material to the project.[6] (*Id.*) Mr. Esparza, OE's owner and sole proprietor, delegated the paving material delivery to Spades Trucking, a sole proprietorship owned by Mario Mares.[7] (*Id.* at 2-3.) At the time, Mr. Mares and the belly dump truck and trailer he was using were in violation of several federal regulations. (*Id.* at 3-5.) Mr. Newnum was an independent contractor whom Mr. Mares hired as a laborer and paid in cash.[8] (*Id.* at 5.)

On August 12, 2020, Mr. Mares was delivering paving material to the Route 64 project when an NMDOT project manager saw that his belly dump trailer was losing material on the roadway. (*Id.* at 1, 5-6.) The project manager directed a MSCI foreman to address the issue, and the MSCI foreman directed Mr. Mares to clean out the trailer. (*Id.* at 6.) Mr. Esparza and Mr. Mares, in turn, directed Mr. Newnum to clean the belly dump gates using diesel and a blow torch, even though the NMDOT prohibits this cleaning method.[9] (*Id.*) When Mr. Mares saw the NMDOT

---

[6] Defendant made this allegation "[u]pon information and belief." (Doc. 1-2 at 3.)

[7] Defendant made this allegation "[u]pon information and belief." (Doc. 1-2 at 3.)

[8] Defendant made this allegation "[u]pon information and belief." (Doc. 1-2 at 5.) Moreover, he modified the allegation in his amended complaint by alleging that Mr. Newnum "was a passenger and friend of [Mr.] Mares as well as [Mr.] Esparza and was not being paid as a worker at the time of his death." *Szantho*, D-101-CV-2021-01136, First Amended Complaint for Wrongful Death at 5.

[9] Defendant made this allegation "[u]pon information and belief." (Doc. 1-2 at 6.) Moreover, he modified the allegation in his amended complaint by alleging that Mr. Esparza directed Mr. Mares to clean the gates and omitting the allegation that anyone directed Mr. Newnum to do so. *Szantho*, D-101-CV-2021-01136, First Amended Complaint for Wrongful Death at 6.

project manager arrive at the scene, he "shut the gates of the belly dump in an attempt to conceal Mr. Newnum, in the act of cleaning the belly dump with diesel."[10] (*Id.* at 7.) "Mr. Newnum was crushed by the gates of the belly dump and fell [to] the ground."[11] (*Id.*) Mr. Mares drove Mr. Newnum to the hospital, where Mr. Newnum later "died … from internal injuries caused by the crushing of the belly dump gates."[12] (*Id.*)

Mr. Esparza and OE notified Plaintiff of the accident that caused Mr. Newnum's death on September 10, 2021. (Doc. 52 at 11; Doc. 54 at 5.) Plaintiff hired counsel to defend Mr. Esparza and OE in Defendant's state court wrongful death action, and counsel appeared in that action on their behalf on September 21, 2021. (*Id.*) The parties draw their remaining material facts from discovery taken in the wrongful death action. (*See* Doc. 52 at 11-12; Doc. 54 at 4-10.)

The NMDOT contracted with MSCI to provide services for the highway construction project on U.S. Route 64, and MSCI subcontracted with OE, which then subcontracted with other trucking companies to provide services on OE's behalf. (Doc. 54 at 6; Doc. 54-1 at 3; Doc. 54-4 at 2-3; Doc. 54-5 at 2-3; Doc. 57 at 4.)

In August 2020, Mr. Esparza owned two belly dump trailers, one of which was made in 1978. (Doc. 52 at 11; Doc. 52-1 at 2; Doc. 54 at 5.) Mr. Esparza loaned the 1978 belly dump trailer

---

[10] Defendant made this allegation "[u]pon information and belief." (Doc. 1-2 at 7.) Moreover, he modified the allegation in his amended complaint by omitting the allegation that Mr. Mares' purpose in shutting the gates was to conceal Mr. Newnum in the act of cleaning the belly dump with diesel. *Szantho*, D-101-CV-2021-01136, First Amended Complaint for Wrongful Death at 6.

[11] Defendant modified this allegation in his amended complaint by omitting the allegation that Mr. Newnum fell to the ground. *Szantho*, D-101-CV-2021-01136, First Amended Complaint for Wrongful Death at 6.

[12] In his wrongful death complaint, Defendant alleged that Mr. Newnum died on August 22, 2020. (Doc. 1-2 at 1, 7.) In his response to Plaintiff's Motion, Defendant alleges that Mr. Newnum died "[o]n August 2019, 2020 [sic]," and the autopsy report attached to the response indicates that he died on August 19, 2020. (Doc. 54 at 10; Doc. 54-8 at 1.) This discrepancy is immaterial to the issues raised in Plaintiff's Motion.

("Belly Dump") to Mr. Mares, who is his son. (Doc. 52 at 11; Doc. 52-1 at 2-6; Doc. 52-2 at 2-3, 7; Doc. 54 at 6.) The Policy does not list the Belly Dump as a scheduled covered auto. (Doc. 1-1 at 4; Doc. 52 at 11; Doc. 54 at 5.) The tractor that Mr. Mares used to tow the Belly Dump on the day of the accident belonged to Mr. Mares or Spades Trucking. (Doc. 52 at 11; Doc. 52-1 at 3, 5; Doc. 52-2 at 2, 7; Doc. 54 at 5.) The insurance covering the tractor had lapsed. (Doc. 54 at 7; Doc. 54-2 at 3; Doc. 57 at 4.)

On the day of the accident, while driving to the project site early in the morning, Mr. Mares saw Mr. Newnum walking on the side of the road and picked him up. (Doc. 54 at 7; Doc. 54-2 at 2, 8; Doc. 57 at 4.) Plaintiff maintains that Mr. Newnum was working for Mr. Mares or Spades Trucking, citing the allegation to that effect in Defendant's original wrongful death complaint as well as Mr. Mares' testimony that Mr. Newnum had never worked as his employee but he sometimes gave Mr. Newnum five dollars to clean his trucks. (Doc. 52 at 10-11 (citing Doc. 1-2 at 5 *and* Doc. 52-2 at 4, 6).) Defendant, however, now disputes his own prior allegation, citing Mr. Mares' deposition testimony that Mr. Newnum was not working for him that day and that he picked Mr. Newnum up because that is what he "always" did when he saw Mr. Newnum.[13] (Doc. 54 at 6 (citing Doc. 54-2 at 2, 8).)

Mr. Esparza arrived at the project site at about 7:00 a.m. and was at the project site "all the time" to oversee the trucking companies he had hired to perform services on his and OE's behalf. (Doc. 54 at 7; Doc. 54-1 at 5, 7; Doc. 57 at 4.)

Belly dump trailers must be cleaned after hauling certain kinds of paving materials. (Doc.

---

[13] Mr. Mares further testified that he "always" gave Mr. Newnum money, and responded to the question, "[d]id [Mr. Newnum] need to work for it or was it just a handout," by stating, "No. Sometimes I just gave it to him." (Doc. 54-2 at 4.) Mr. Esparza, in turn, testified that "really [Mr. Newnum] never work[ed] for us," and that on the day of the accident "he was just hanging around," though Mr. Esparza "figure[d]" that if Mr. Newnum was "helping out a little," Mr. Mares would give Mr. Newnum "a little extra money." (Doc. 54-1 at 5.)

54 at 7; Doc. 54-2 at 10-11; Doc. 57 at 4.) On the day of the accident, NMDOT supervisor Cassie Peskor saw that the Belly Dump was expelling material where it should not and instructed MSCI employee Barry Tibbetts to address the problem. (Doc. 54 at 7; Doc. 54-4 at 3; Doc. 57 at 4.) Mr. Tibbetts noticed that the Belly Dump's gates were not closed and told Mr. Mares to clean the gates so they would close. (Doc. 54 at 7-8; Doc. 54-4 at 3; Doc. 54-6 at 2; Doc. 57 at 4.) Mr. Esparza overheard Ms. Peskor say that the gates needed to be cleaned. (Doc. 54 at 8; Doc. 54-1 at 6; Doc. 57 at 4.)

Mr. Mares, with Mr. Newnum still riding as his passenger, drove the Belly Dump to the "clean[-]out pile" in order to clean the gates. (Doc. 54 at 8; Doc. 54-1 at 9, 11; Doc. 54-2 at 4; Doc. 57 at 4.) Mr. Esparza and Ms. Peskor followed the Belly Dump to the clean-out pile in separate vehicles. (Doc. 54 at 8; Doc. 54-1 at 9; Doc. 54-2 at 4; Doc. 57 at 4.) Both Mr. Esparza and Mr. Mares knew they were not supposed to use diesel to clean the Belly Dump. (Doc. 54 at 8-9; Doc. 54-1 at 8; Doc. 54-2 at 12; Doc. 57 at 4.)

Mr. Mares asked Mr. Newnum if he would help clean the Belly Dump gates, and the two exited the tractor towing the Belly Dump.[14] (Doc. 54 at 8-9; Doc. 54-2 at 4-5, 12; Doc. 57 at 4.) Mr. Esparza, who was talking to Ms. Peskor, saw Mr. Newnum approaching with a diesel container and told him, in Spanish, to "watch out" because Ms. Peskor was there. (Doc. 54 at 9; Doc. 54-1 at 9, 12; Doc. 57 at 4.) Mr. Esparza testified[15] that he saw Mr. Newnum put down the diesel container and walk away and then, within about 30 seconds, suddenly fall face first on the ground.

---

[14] In his response to Plaintiff's Motion, Defendant cites to Ms. Peskor's deposition to support the undisputed fact that Mr. Mares and Mr. Newnum exited the tractor. (Doc. 54 at 9 (citing Doc. 54-4 at 5-6).) However, this citation appears to be a typographical error because the cited lines of Ms. Peskor's deposition do not support this undisputed fact, while the cited lines of Mr. Mares' deposition do. (*Compare* Doc. 54-2 at 4-5 *with* Doc. 54-4 at 5-6.)

[15] In his undisputed material facts, Defendant describes Mr. Esparza's testimony on this point but does not expressly adopt its substance. (Doc. 54 at 9.)

(Doc. 54 at 9; Doc. 54-1 at 9, 12; Doc. 57 at 4.) Mr. Mares, in turn, testified[16] that he heard Mr. Esparza tell Mr. Newnum something and saw Mr. Newnum hide the diesel container but was then looking at his phone until he looked up and saw Mr. Newnum on the ground. (Doc. 54 at 9; Doc. 54-2 at 5; Doc. 57 at 4.) Ms. Peskor remained in her vehicle checking emails on her phone until she looked up and saw Mr. Newnum on the ground. (Doc. 54 at 9; Doc. 54-4 at 4; Doc. 57 at 4.) "[N]o one perceived [Mr. Newnum] being injured before he collapsed."[17] (Doc. 54 at 9; Doc. 57 at 4.)

Relying on the allegations in Defendant's original wrongful death complaint, Plaintiff maintains that Mr. Newnum was crushed when Mr. Mares shut the Belly Dump gates while Mr. Newnum was inside the Belly Dump cleaning the gates. (Doc. 52 at 10 (citing Doc. 1-2 at 7).) However, Defendant now disputes that Mr. Newnum was inside the Belly Dump, citing Sergeant Justin Tucker's deposition testimony that he believed Mr. Newnum could not have been crushed *between* the Belly Dump gates, because if he had been, "he probably would have been severed or a lot worse than he was."[18] (Doc. 54 at 5 (citing Doc. 54-3 at 3).) Sergeant Tucker further testified to his belief that Mr. Newnum

> was *underneath* the [B]elly [D]ump doors cleaning off the asphalt with diesel, and when [Ms. Peskor] came to the truck, either [Mr. Mares] or [Mr. Esparza] … didn't realize that Mr. [Newnum] was under there, and they … shut the [B]elly [D]ump door. … And when [the door] comes down together, there's only X amount of

---

[16] In his undisputed material facts, Defendant describes Mr. Mares' testimony on this point but does not expressly adopt its substance. (Doc. 54 at 9.)

[17] Asked why Mr. Newnum fell to the ground, Mr. Esparza responded, "I really don't know. I think maybe he stumbled on the piles. I don't know. I don't know." (Doc. 54-1 at 12.) But regardless of his belief about why Mr. Newnum fell, Mr. Esparza confirmed that he does not know how Mr. Newnum sustained fatal crush injuries. (*Id.* at 10.)

[18] In their summary judgment briefing, neither side describes Sergeant Tucker's professional affiliation or any expertise he might possess. (*See generally* Docs. 52, 54, 57.) However, at his deposition, Mr. Esparza testified that Sergeant Tucker was "[a] police officer [o]r DOT officer"; and, the title of an exhibit purportedly attached to Mr. Esparza's deposition suggests that Sergeant Tucker is or was a New Mexico State Police officer who prepared a report regarding the accident at issue. (Doc. 52-1 at 1, 5.) In his deposition testimony, Sergeant Tucker refers to Mr. Newnum as "Mr. Nunez." (*See generally* Doc. 54-3.)

clearance from the ground to the top of the [B]elly [D]ump door. And so when it came down, it basically just squished Mr. [Newnum], unfortunately.

(Doc. 54-3 at 4 (emphasis added).)

Mr. Mares drove Mr. Newnum from the clean-out pile to the hospital. (Doc. 54 at 9; Doc. 54-2 at 6; Doc. 57 at 4.) Mr. Newnum died several days later of "[c]omplications of blunt thoracoabdominal trauma," including lacerated bilateral kidneys, left lung, spleen, and diaphragm, bilateral rib fractures, bilateral hemothoraces, and bruised and abraded trunk and arms. (Doc. 54 at 10; Doc. 54-8 at 1-2; Doc. 57 at 4.)

**C.    Discussion**

In the present Motion, Plaintiff seeks a summary judgment declaring that, as a matter of law, it has no duty under the Policy to indemnify Mr. Esparza, OE, or Defendant for the claims brought in Defendant's wrongful death action. (Doc. 52 at 1-2, 22.) In support, Plaintiff argues that: (1) the Policy's Auto Component provides no coverage because the Belly Dump is not a covered auto, (*id.* at 14-17); (2) the liability portion of the Policy's CGL Component provides no coverage because it excludes coverage for losses arising out of the use of an insured's auto, (*id.* at 17-21); (3) the medical payments portion of the CGL Component provides no coverage because it incorporates the exclusions in the liability portion and also excludes coverage for hired persons, (*id.* at 21); and, (4) the Policy excludes coverage for punitive or exemplary damages. (*Id.* at 21-22.) The Court will first discuss New Mexico law governing insurance contracts and will then apply these principles to Plaintiff's arguments.[19]

**1.    New Mexico Law Governing Insurance Contracts**

Under New Mexico law, courts construe insurance policies using the same principles that

---

[19] The parties have stipulated that substantive New Mexico law applies in this diversity case. (Doc. 35 at 3.)

govern the interpretation of all contracts. *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 18, 945 P.2d 970, 976 ("*Rummel I*"). When an insurance policy is unambiguous, courts must enforce its terms as written unless they contravene public policy. *New Mexico Physicians Mut. Liab. Co. v. LaMure*, 1993-NMSC-048, ¶¶ 9-10, 860 P.2d 734, 737 ("*LaMure*"). Unambiguous terms must be applied "in their usual and ordinary sense unless the language of the policy requires something different." *Id.* at ¶ 9, 860 P.2d at 737. However, courts must construe ambiguous terms against the drafter, giving them "the strongest interpretation against the insurer which they will reasonably bear." *Rummel I*, 1997-NMSC-041, ¶ 22, 945 P.2d at 977. "When there is ambiguity … the test is not what the insurer intended its words to mean, but what a reasonable person in the insured's position would have understood them to mean." *W. Com. Bank v. Reliance Ins. Co.*, 1987-NMSC-009, ¶ 8, 732 P.2d 873, 875.

The terms of an insurance policy are deemed ambiguous only if they are "reasonably and fairly susceptible of different constructions." *Knowles v. United Servs. Auto Ass'n*, 1992-NMSC-030, ¶ 9, 832 P.2d 394, 396. "An "ambiguity does not exist simply because a controversy exists between the parties," *Battishill v. Farmers All. Ins. Co.*, 2006-NMSC-004, ¶ 17, 127 P.3d 1111, 1115 (quotation marks omitted), and "courts should not create ambiguity where none exists." *United Nuclear Corp. v. Allstate Ins. Co.*, 2012-NMSC-032, ¶ 10, 285 P.3d 644, 647 (quotation marks omitted). Courts may consider extrinsic evidence in determining whether policy terms are ambiguous. *Id.* at ¶ 13, 285 P.3d at 648 (citing *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235).

"The fact that a particular policy contains a broad coverage provision followed by a specific coverage exclusion does not automatically render the policy ambiguous or invalidate the exclusion … as long as the exclusion is not so broad or nebulous that it swallows and effectively nullifies a

broad insuring clause." *LaMure*, 1993-NMSC-048, ¶ 10, 860 P.2d at 737. "In other words, general expressions of coverage in the insuring clause of an insurance policy do not render ineffective the limitations provided by exclusions stated in subsequent clauses of the policy." *Weldon v. Com. Union Assur. Co.*, 1985-NMSC-118, ¶ 9, 710 P.2d 89, 91 (quotation marks omitted). Rather, exclusions in insurance policies "are to be enforced so long as their meanings are clear and they do not conflict with the statutory law." *Safeco Ins. Co. of Am. v. McKenna*, 1977-NMSC-053, ¶ 8, 565 P.2d 1033, 1035; *see also Jimenez v. Found. Reserve Ins. Co.*, 1988-NMSC-052, ¶ 9, 757 P.2d 792, 794 (holding that policy exclusions "will be enforced" if they (1) "are clear and unambiguous in meaning" and (2) "do not conflict with public policy stated in express statutory language or by indication of legislative intent").

In the context of insurance policies, "the distinction between an exclusion and a provision of coverage is very important, because it affects which party bears the burden of proof." *Nilson v. Peerless Indem. Ins. Co.*, 484 F. Supp. 3d 1050, 1080 (D.N.M. 2020). The party seeking coverage bears the initial burden to show that a coverage provision applies to the claimed loss. *Cafe Plaza de Mesilla Inc. v. Cont'l Cas. Co.*, 519 F. Supp. 3d 1006, 1010 (D.N.M. 2021) (citing *Battishill*, 2006-NMSC-004, ¶ 6, 127 P.3d at 1113); *see also Chronister v. State Farm Mut. Auto. Ins. Co.*, 1963-NMSC-093, ¶ 8, 381 P.2d 673, 675 ("The burden of proof is on the [party seeking coverage] to establish the policy's coverage of the injurious event."). If the party seeking coverage meets this burden, then the burden shifts to the insurer to show that the policy nevertheless excludes coverage. *Cafe Plaza de Mesilla Inc.*, 519 F. Supp. 3d at 1010; *see also Texas E. Transmission Corp. v. Marine Off.-Appleton & Cox Corp.*, 579 F.2d 561, 564 (10th Cir. 1978) ("The general rule … is that the burden is upon the insured to prove that a loss occurred and that it was due to some fortuitous event or circumstance. Then the burden shifts to the [insurer] to show that the loss was

one excluded by some language set out in the policy.") (citations omitted); *Abbasid, Inc. v. Travelers Indem. Co.*, 2010 WL 11493720, at *2 (D.N.M. Mar. 10, 2010), *aff'd*, 404 F. App'x 253 (10th Cir. 2010) ("[T]he insurance company must plead exclusions as affirmative defenses for which the insurer carries the burden of proof.").

### 2. The Policy's Auto Component provides no coverage because the Belly Dump is not a covered auto.

Plaintiff first argues that the Policy's Auto Component undisputedly provides no coverage for liability or losses arising out of Mr. Newnum's death because the Belly Dump is not a "covered auto" under that component. (Doc. 52 at 14-17.) Defendant does not address this argument in his response to Plaintiff's Motion. (*See generally* Doc. 54.)

Under Local Civil Rule 7.1, "[t]he failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M.LR-Civ. 7.1(b). "Implicit in that rule is that the failure to respond to an argument raised in a motion constitutes consent to grant the motion to the extent associated with that particular argument." *Lewis v. XL Catlin*, 542 F. Supp. 3d 1159, 1168 n.6 (D.N.M. 2021), *appeal dismissed*, 2021 WL 6197126 (10th Cir. 2021); *see also Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768-69 (10th Cir. 2001) (affirming trial court's holding that plaintiff abandoned claim by failing to address it in response to summary judgment motion); *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992) (holding that plaintiff's failure to challenge defendants' summary judgment arguments was "fatal"). Thus, Defendant's failure to respond to Plaintiff's argument that the Auto Component provides no coverage because the Belly Dump is not a covered auto constitutes consent to grant Plaintiff's Motion as to that argument.

Further, on the undisputed record evidence, no rational factfinder could conclude that the Auto Component provides coverage for liability or losses arising out of Mr. Newnum's death. The

Auto Component provides coverage for (1) an insured's liability arising out of the ownership, maintenance, or use of a covered auto, and (2) medical payments and funeral expenses incurred by or on behalf of anyone injured in an accident while occupying a covered auto.[20] (Doc. 1-1 at 7-8.) Thus, the Auto Component could provide coverage only if Mr. Newnum's death involved a covered auto. (*See id.*)

The Policy lists three scheduled covered autos, *i.e.*, a 1995 Red River belly dump, a 2004 Peterbilt 387, and a 1988 Kenworth T600A. (Doc. 1-1 at 4.) The 2004 Peterbilt and the 1988 Kenworth are tractors, and the scheduled belly dump trailer was made in 1995. (*Id.*; Doc. 52-1 at 2.) The Belly Dump that Mr. Esparza loaned to Mr. Mares on the day of the accident, in contrast, was made in 1978. (Doc. 52-1 at 2-6.) Not surprisingly, then, Defendant admits that "the 1978 belly dump is not a listed scheduled covered auto on the Policy." (Doc. 52 at 11; Doc. 54 at 5.) Nor does Defendant point to any other policy provision that would operate to make the Belly Dump a covered auto. (*See generally* Doc. 54.)

As discussed in Section II.C.1., above, the party seeking coverage bears the initial burden to show that a coverage provision applies to the claimed loss. *Cafe Plaza de Mesilla Inc.*, 519 F. Supp. 3d at 1010. Defendant has made no attempt to meet that burden with respect to the Policy's Auto Component. Moreover, the undisputed record evidence shows that the Auto Component's coverage provisions do not in fact apply. Thus, as a matter of law, the Auto Component provides no coverage for Defendant's wrongful death claims or for any expenses arising out of Mr. Newnum's death; and, Plaintiff is entitled to a summary judgment declaring that it has no duty to indemnify Mr. Esparza, OE, or Defendant under that component.

---

[20] As noted in Section II.B., *supra*, the medical payments portion of the Auto Component provides additional, broader coverage for named insureds and their family members. (Doc. 1-1 at 8.) But again, there is no allegation, argument, or evidence in the record that Mr. Newnum was a named insured, or a family member of a named insured. (*See* Docs. 1, 52, 54, 57.)

**3.   The liability portion of the CGL Component provides no coverage because it excludes coverage for losses arising out of the use, maintenance, or entrustment of an insured's auto.**

Plaintiff next argues that the liability portion of the Policy's CGL Component provides no coverage because: (a) this portion of the Policy excludes coverage for bodily injury or property damage arising out of the use, maintenance, or entrustment to others of any auto owned by an insured; and, (b) Mr. Newnum's death arose out of the use, maintenance, or entrustment of such a vehicle. (Doc. 52 at 17-21.) Defendant disagrees, arguing that the auto exclusion does not apply because the Belly Dump was only "tangential[ly]" involved in the accident at issue and Mr. Newnum was actually "killed by [Mr. Esparza's] dangerous behavior." (Doc. 54 at 12-13.) As explained below, the Court concludes that, as a matter of law, the auto exclusion in the liability portion of the CGL Component excludes coverage for Defendant's wrongful death claims.

As discussed in Section II.B., *supra*, the liability portion of the CGL Component excludes from its broad grant of coverage "[b]odily injury or property damage arising out of the … maintenance, use or entrustment to others of any … auto … owned … by … any insured."[21] (Doc. 1-1 at 10-11 (quotation marks omitted).) And as noted in Section II.C.1., *supra*, courts will enforce insurance policy exclusions when they "are clear and unambiguous" and "do not conflict with public policy[.]" *LaMure*, 1993-NMSC-048, ¶ 9, 860 P.2d at 737; *Jimenez*, 1988-NMSC-052, ¶ 9, 757 P.2d at 794. Thus, to determine whether the auto exclusion in the liability portion of the CGL Component precludes coverage for Defendant's wrongful death claims, the Court must first consider whether the exclusion is clear and unambiguous and comports with public policy.

As to the first point, *i.e.*, the clarity of the exclusion, "[t]he only phrase susceptible to potential ambiguity" in light of the arguments in Defendant's response "is 'arising out of.'"

---

[21] As noted in Section II.B., *supra*, this provision does not purport to negate the Auto Component's coverage for an insured's liability arising out of the ownership, maintenance, or use of a covered auto. (*See generally* Doc. 1-1.)

*Evanston Ins. Co. v. Desert State Life Mgmt.*, 56 F.4th 899, 908 (10th Cir. 2022) ("*Evanston*");

(*see generally* Doc. 54.) But in *Evanston*, the Tenth Circuit observed that the New Mexico Court

of Appeals has "provide[d] a clear answer about [the] meaning" of the phrase "arising out of," and

predicted that the New Mexico Supreme Court would adopt the meaning the state appellate court

has "uniformly" used.[22] 56 F.4th at 908 (citing *Krieger v. Wilson Corp.*, 2006-NMCA-034, ¶ 14,

131 P.3d 661, 666; *Baca v. N.M. State Highway Dep't*, 1971-NMCA-087, ¶ 14, 486 P.2d 625,

628). The *Evanston* court further noted that the New Mexico Supreme Court has twice read a

similar phrase, *i.e.*, "'arising from," in an exclusionary clause to be unambiguous. *Id.* (citing *Lopez*

*v. N.M. Pub. Sch. Ins. Auth.*, 1994-NMSC-017, 870 P.2d 745, 747; *Askew v. Miller Mut. Fire Ins.*

*Co. of Tex.*, 1974-NMSC-040, 522 P.2d 574, 575). The *Evanston* court therefore concluded that

the phrase "arising out of" in an exclusionary clause is unambiguous and enforced a policy

exclusion using this phrase as written.[23] *Id.* at 909. Under *Evanston*, the phrase "arising out of" in

the auto exclusion in the liability portion of the CGL Component is clear and unambiguous and

must be applied as written. *Id.* at 908-09; *see also Hanover Ins. Co. v. Jones*, 979 F. Supp. 2d 1210,

1218 (D. Kan. 2013) (enforcing an auto exclusion virtually identical to the auto exclusion at issue

in the present matter "[b]ased on a plain reading" of it).

        As to the second point, *i.e.*, whether the CGL Component's auto exclusion comports with

public policy, the Court finds that it does. In *Charter Oak Fire Insurance Company v. Hoylik*, 2017

WL 6060600 (D.N.M. Dec. 6, 2017) ("*Charter Oak*"), the court discussed an auto exclusion

---

[22] As further discussed below, the Tenth Circuit in *Evanston*, and the New Mexico Court of Appeals in the decisions on which the Tenth Circuit relied, understood the phrase "arising out of" to mean "'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'" *Evanston*, 56 F.4th at 908-09; *Krieger*, 2006-NMCA-034, ¶ 14, 131 P.3d at 666; *Baca*, 1971-NMCA-087, ¶ 14, 486 P.2d at 628.

[23] At issue in *Evanston* was an exclusion barring coverage for claims "arising out of any conversion, misappropriation, commingling of or defalcation of funds or property." 56 F.4th at 908 (brackets omitted).

virtually identical to the one at issue here. *See id.* at *2, *8-*9. As in this case, the insured in *Charter Oak* had purchased an automobile insurance policy along with a general liability policy that included the auto exclusion at issue. *Id.* at *9.

The *Charter Oak* court explained that "[l]iability for operation of a motor vehicle is usually not within the risk which general liability policies are designed to cover" and that "[a]utomobile exclusions in general liability policies exist to exclude coverage of risks normally covered by automobile insurance." *Id.* at *8-*9. Thus, as a matter of public policy, the court refused to void the general liability policy's auto exclusion and thereby "convert [the] general liability policy into an automobile policy." *Id.* at *9 (citing cases).

This Court likewise concludes that the auto exclusion at issue operates permissibly to exclude coverage of risks normally covered by auto insurance. As in *Charter Oak*, the propriety of the exclusion is particularly clear here because the Policy includes not only a CGL Component, but also an Auto Component which provides the auto insurance coverage Mr. Esparza chose to purchase. (Doc. 1-1 at 3-5.) As a matter of public policy, the Court declines to void the CGL Component's auto exclusion and thereby convert the Policy's general liability coverage to automobile coverage.

In his response, Defendant does not directly address whether the auto exclusion at issue is unambiguous and comports with public policy. (*See generally* Doc. 54.) However, he does implicate these issues obliquely by arguing that, "[c]onsidering the nature of Mr. Esparza's [trucking] business, it was all but guaranteed that a claim against it would involve—in some way— a truck," and thus, "[f]or this not to be an illusory policy," the Court should construe the auto exclusion to apply only where the tortfeasor's alleged misconduct "is so intertwined with the vehicle that there is no independent non-auto-related act." (*Id.* at 11 (citing *Associated Indus. Ins.*

*Co., Inc. v. Ridgewyck Ventures, LLC*, 611 F. Supp. 3d 1272 (D. Utah 2020) ("*Ridgewyck*"))); *cf.*

*generally Crutcher v. Liberty Mut. Ins. Co.*, 2022-NMSC-001, ¶¶ 2, 20, 28, 501 P.3d 433, 434,

438, 440 (holding that insurance policy was "illusory" where it would be "practically impossible"

for class of insureds to collect under it, and that insurer could only charge premiums for such

coverage if it adequately disclosed the coverage limitations).

     Defendant's argument is unhelpful for three reasons. First, it is factually inaccurate, in that

one can readily and plausibly hypothesize garden-variety claims against Mr. Esparza's trucking

business that would not involve a truck. For example, Mr. Esparza's business could be subject to

claims alleging that a visitor to his business premises slipped and fell on a patch of ice or a puddle

of water. Thus, even if the auto exclusion were construed so broadly as to apply to all claims

"involv[ing]—in some way" a non-covered auto,[24] (Doc. 54 at 11), the exclusion would not render

the liability portion of the CGL Component illusory by making coverage "practically impossible,"

*Crutcher*, 2022-NMSC-001, ¶ 20, 501 P.3d at 438, or "effectively nullif[ying]" the liability

portion's "broad insuring clause." *LaMure*, 1993-NMSC-048, ¶ 10, 860 P.2d at 737.

     Second, the test Defendant proposes does not use the definition of "arising out of" that the

Tenth Circuit has predicted the New Mexico Supreme Court would apply. Specifically, in

*Evanston*, the Tenth Circuit predicted that the New Mexico Supreme Court would apply this phrase

in its usual sense to mean "'originating from,' 'having its origin in,' 'growing out of' or 'flowing

from.'" *Evanston*, 56 F.4th at 908-09 (citing *Krieger*, 2006-NMCA-034, ¶ 14, 131 P.3d at 666;

*Baca*, 1971-NMCA-087, ¶ 14, 486 P.2d at 628; *Am. Nat'l Prop. & Cas. Co. v. United Specialty

Ins. Co.*, 592 F. App'x 730, 742 (10th Cir. 2014)). The Court declines Defendant's invitation to

---

[24] However, this "involved in some way" test is a straw man Defendant sets up to knock down because, as further discussed below, it is not the test the Tenth Circuit has predicted the New Mexico Supreme Court would use to apply a policy exclusion that includes the phrase "arising out of." *See Evanston*, 56 F.4th at 908-09.

stray from the plain-meaning definition the Tenth Circuit has applied. *See id.*

Third, *Ridgewyck*, 611 F. Supp. 3d at 1272, the case Defendant cites in support of the construction he proposes, involved neither New Mexico law nor an auto exclusion. And though the *Ridgewyck* court did discuss a Utah Court of Appeals case in which the court applied an auto exclusion, *i.e.*, *Taylor v. American Fire & Casualty Co.*, 925 P.2d 1279 (Utah App. 1996), that case did not involve New Mexico law, either, and the Court declines to rely on it to supplant the *Evanston* court's New-Mexico-specific definition of the phrase "arising out of."[25] Further, as discussed below, though *Taylor* used different language than *Evanston* to define that phrase, as a practical matter the two definitions generate the same result. For all of these reasons, the Court finds that the auto exclusion in the liability portion of the CGL Component is unambiguous and consistent with public policy and that the Court must enforce it as written, using the plain-meaning definition of the phrase "arising out of" that the *Evanston* court described.

Accordingly, the Court next considers whether, as a matter of law, Defendant's wrongful death claims fall within the scope of the auto exclusion in the liability portion of the CGL Component. In this regard, the Court notes that "[i]n determining the applicability of an exclusion, the focus must be on the *origin* of the damages, *not* the *legal theory* asserted for recovery." *Lopez*, 1994-NMSC-017, ¶ 8, 870 P.2d at 747 (emphases in original) (brackets omitted); *accord Ridgewyck*, 611 F. Supp. 3d at 1281–82 ("[W]hen interpreting an exclusion based upon an … instrumentality, the focus is on the underlying cause of the injuries, and not the theory of liability asserted by the complaining party."). Thus, in determining whether Mr. Newnum's death arose out

---

[25] In *Taylor*, the court found that the auto exclusion at issue in that case precluded coverage for the plaintiff's claims that the defendant parents had negligently supervised their daughter, who injured the plaintiff in an accident while driving her parents' uninsured vehicle without permission. 925 P.2d at 1280-85. In so holding, the court found that the auto exclusion barred coverage because the parents' alleged negligence "could not have resulted in injury but for the use of the automobile." *Id.* at 1283.

of the use, maintenance, or entrustment to others of an insured's auto, the Court's focus must be on the cause or origin of Mr. Newnum's injuries, and not on the legal theories on which Defendant has relied in attempting to hold Mr. Esparza and OE liable.

Turning to the summary judgment record in this case, the Court notes as a preliminary matter that Plaintiff has not submitted the portion of the Policy that defines the term "auto" to show that the Belly Dump is an auto under the Policy. (*See generally* Docs. 1-1, 52.) However, Plaintiff does expressly assert that "the [B]elly [D]ump was a non-covered owned auto" under the Policy and does present other evidence, albeit indirect, to support the assertion. (Doc. 52 at 20.) Specifically, in its statement of undisputed material facts, Plaintiff notes that the Policy refers to a "1995 Red River belly dump" trailer as a covered scheduled auto and cites to portions of the Policy in the record to prove it. (*Id.* at 6, 11 (citing Doc. 1-1 at 4, 6-7); *see also* Doc. 52-1 at 2.) This evidence supports the inference that, like the 1995 belly dump, the 1978 Belly Dump is an auto, though not a covered scheduled one, under the Policy.

Moreover, in his response, Defendant does not dispute that the Belly Dump is an auto under the Policy, nor does he submit or cite to any record evidence tending to support the inference that it is not. (*See generally* Doc. 54.) On the contrary, he consistently suggests that the Belly Dump *is* an auto by stating that the "auto exclusion" applies to "vehicles" and also referring to the Belly Dump as a "vehicle."[26] (*See, e.g.*, *id.* at 11-12.) In these circumstances, Defendant has effectively conceded that the Belly Dump is an auto under the Policy, and his failure to respond to Plaintiff's

---

[26] Though a layperson might hesitate to call a trailer a "motor vehicle," it is also worth noting that Defendant alleged in his wrongful death complaint, and admits in his response, that the Belly Dump was a motor vehicle subject to (and in violation of) various Federal Motor Carrier Safety Administration ("FMCSA") regulations. (Doc. 52 at 10 (citing Doc. 1-2 at 4-5); Doc. 54 at 4); *see generally* 49 C.F.R. § 390.5 (defining "motor vehicle" as "any vehicle, machine, tractor, *trailer, or semitrailer* propelled *or drawn by* mechanical power and used upon the highways in the transportation of passengers or property") (emphases added).

argument on this point constitutes consent to grant Plaintiff's Motion as to that argument.[27] *Lewis*, 542 F. Supp. 3d at 1168 n.6. The Court therefore concludes that the Belly Dump is undisputedly an auto under the Policy.

Having addressed this preliminary point, the Court turns to the subject of the parties' disagreement regarding whether the auto exclusion in the CGL Component applies, *i.e.*, whether Mr. Newnum's death arose out of the Belly Dump's use, maintenance, or entrustment to others. To meet its initial summary judgment burden on this issue, Plaintiff points to undisputed record evidence that, at the time of the accident: (1) Mr. Esparza owned the Belly Dump but loaned it to Mr. Mares; (2) Mr. Mares was using it to deliver paving material; and, (3) Mr. Mares asked Mr. Newnum to help him clean its gates. (Doc. 52 at 11-12.) Plaintiff further relies on the allegations in Defendant's wrongful death complaint that: (4) on information and belief, Mr. Mares shut the gates with Mr. Newnum inside, to conceal that he and Mr. Newnum were using a prohibited method to clean the gates; (5) the gates crushed Mr. Newnum; and, (6) "Mr. Newnum died … from internal injuries caused by the crushing of the [B]elly [D]ump gates." (*Id.* at 10 (citing Doc. 1-2 at 7).) According to Plaintiff, as a matter of law, these facts and allegations establish that Mr. Newnum's death arose out of the use, maintenance, or entrustment to others of the Belly Dump, *i.e.*, an auto owned by an insured. (*Id.* at 14-17.)

Defendant does not dispute that he made the above factual allegations in his original wrongful death complaint. (*See generally* Doc. 54.) However, he claims that "discovery in the

---

[27] In the parties' Joint Status Report and Provisional Discovery Plan, Defendant contended that the Belly Dump "constitutes an unlisted covered auto" under the Policy, on the basis that the Auto Component extends liability coverage to certain unscheduled autos including "trailers with a load capacity of 2000 pounds or less [designed] primarily for travel on public roads." (Doc. 35 at 4; *see* Doc. 1-1 at 7.) Because Defendant does not make or support this contention in his summary judgment response, the Court declines to rely on it as a separate concession that the Belly Dump is an auto under the Policy. (*See generally* Doc. 54.) However, the Court does note that in the coverage provision on which Defendant relies to support this contention, "[t]railers" are classified as a type of "auto." (Doc. 1-1 at 7.)

underlying wrongful death matter" subsequently revealed contradictory facts, most particularly that Mr. Newnum "could not have been inside the [B]elly [D]ump when the gates were shut or he would have been severed in two."[28] (*Id.* at 3, 5.) Defendant further suggests that no one knows exactly how Mr. Newnum was killed, arguing that "[i]t is unknown where Mr. Newnum was in relation to the gates of the [B]elly [D]ump when he sustained crush injuries" and "no one perceived [him] being injured before he collapsed." (*Id.* at 5, 9.) Nevertheless, Defendant tacitly admits that the Belly Dump was "somehow" involved in Mr. Newnum's death, arguing that Mr. Esparza's and OE's negligence "was not *completely* intertwined with the vehicle," the "vehicle's involvement [was] only tangential to" Mr. Newnum's injuries, and Mr. Newnum's injuries "were not caused … by a vehicle *alone*." (*Id.* at 11-13 (emphases added).)

To resolve Plaintiff's Motion in the face of Defendant's changed position regarding how Mr. Newnum was fatally injured requires a careful analysis of not only the record evidence, but also the parties' respective burdens of proof and the effect of the factual allegations in Defendant's wrongful death complaint. As the party moving for summary judgment on the basis of an insurance policy exclusion, Plaintiff bears the initial burden to show all of the essential elements of its claim as a matter of law. *Donner*, 778 F.3d at 876; *Cafe Plaza de Mesilla Inc.*, 519 F. Supp. 3d at 1010. As noted above, Plaintiff seeks to meet this burden by relying on, among other things, the factual allegations in Defendant's original wrongful death complaint that Mr. Newnum died from the injuries he sustained when the Belly Dump gates crushed him. For the following reasons, the Court finds that these allegations are admissible evidentiary admissions.

---

[28] As further discussed below, in support of this factual allegation, Defendant cites to the deposition testimony of Sergeant Tucker, who testified to his belief—unsupported by any personal knowledge or identified expertise—that if Mr. Newnum had been between the gates when they were shut, "he probably would have been severed or a lot worse than he was." (Doc. 54 at 5 (citing Doc. 54-3 at 3).)

"[A]dmissions in the pleadings are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended." *Saghian v. Shemuelian*, 835 F. App'x 351, 353 (10th Cir. 2020); *Grynberg v. Bar S Servs., Inc.*, 527 F. App'x 736, 739 (10th Cir. 2013); *see also United States v. E.F.*, 920 F.3d 682, 688 (10th Cir. 2019) ("Judicial admissions … appropriately refer to admissions in the pleadings[.]"). "True judicial admissions are binding in the entirety of the case in which they were made." *Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1212 n.3 (10th Cir. 2017). However, judicial admissions made in a prior or collateral case are "ordinary evidentiary admissions" that "can be controverted or explained by a party." *Id.*

In the Tenth Circuit, "[i]nconsistent allegations contained in prior pleadings are admissible in subsequent litigation." *LWT, Inc. v. Childers*, 19 F.3d 539, 542 (10th Cir. 1994); *Dugan v. EMS Helicopters, Inc.*, 915 F.2d 1428, 1431 (10th Cir. 1990); *see also Glaesman v. Shop-Rite Foods, Inc.*, 438 F.2d 341, 342 (10th Cir. 1971) (holding that inconsistent allegations in "pertinent parts of the pleadings … filed in [the defendant's prior] suit against its landlord" were admissible). Such allegations may be admissible as "an admission against interest pursuant to [Federal Rule of Evidence] 801(d)(2)," and may also be used for impeachment. *Dugan*, 915 F.2d at 1434. To be an admissible admission, the prior allegation must be factually inconsistent with a position the party is pursuing in the case at bar and must not be "hypothetical or alternative in nature." *Id.*

Here, allegations in Defendant's prior pleading on which Plaintiff relies are factually inconsistent with the position Defendant is taking in the case at bar and are not hypothetical or alternative in nature. In his original wrongful death complaint, Defendant affirmatively and unequivocally alleged that "Mr. Newnum was crushed by the gates of the [B]elly [D]ump" and "died … from internal injuries caused by the crushing of the [B]elly [D]ump gates."[29] (Doc. 1-2 at

[29] Defendant further alleged, on information and belief, that Mr. Newnum was crushed when Mr. Mares shut the Belly Dump gates while Mr. Newnum was in the act of cleaning them. (Doc. 1-2 at 7.) In their summary judgment briefing,

7.) These allegations are factually inconsistent with Defendant's current position that he does not know how Mr. Newnum was crushed or where Mr. Newnum was in relation to the Belly Dump gates when he was injured but the Belly Dump was only tangentially involved in the accident. (Doc. 54 at 5, 9, 11-14.) Thus, the allegations are admissible as admissions under Rule 801(d)(2) and Plaintiff may rely on them to meet its initial summary judgment burden.[30]

Moreover, along with the undisputed record evidence on which Plaintiff relies, these admissions satisfy Plaintiff's initial burden to establish all of the essential elements of its claim that the auto exclusion precludes coverage for Defendant's wrongful death claims under the liability portion of the CGL Component. As discussed in Section II.B., *supra*, it is undisputed that, at the time of the accident: (1) the Belly Dump belonged to Mr. Esparza doing business as OE; (2) Mr. Esparza and OE were insureds under the Policy; (3) Mr. Esparza loaned the Belly Dump to Mr. Mares; (4) Mr. Mares was using the Belly Dump to deliver paving material; and, (5) Mr. Mares asked Mr. Newnum to help him clean the Belly Dump gates. These undisputed facts, along with Defendant's admissions that Mr. Newnum sustained fatal injuries when the Belly Dump gates crushed him, establish that Mr. Newnum's death arose out of the use, maintenance, or entrustment to others of an insured's auto, in the plain-meaning sense that his death originated from, had its origin in, grew out of, and flowed from such use, maintenance, or entrustment.[31] *Evanston*, 56

---

neither party addresses whether the fact that an allegation is made on information and belief affects the allegation's admissibility as an admission. (*See generally* Docs. 52, 54, 57.) The Court need not resolve that issue here because, as the discussion below makes clear, the undisputed record evidence and Defendant's unqualified factual allegations establish that Mr. Newnum's death arose out of the Belly Dump's use, maintenance, or entrustment to others even without any additional allegations Defendant made on information and belief.

[30] Notably, Defendant repeated these allegations when he amended his original wrongful death complaint *after* the purportedly contradictory discovery on which he now relies was taken. *Szantho*, D-101-CV-2021-01136, First Amended Complaint for Wrongful Death at 6-7.

[31] Likewise, under these circumstances, it is beyond rational debate that the Belly Dump was a but-for cause of Mr. Newnum's death, and that his death therefore arose out of the use, maintenance, or entrustment to others of an insured's auto under the auto-exclusion test used in *Taylor*, 925 P.2d at 1283.

F.4th at 908-09.

Plaintiff having met its initial summary judgment burden, the burden shifts to Defendant, *Tesone*, 942 F.3d at 994, to "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant … by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (quotation marks omitted). In other words, the burden shifts to Defendant to present cognizable evidence that, viewed in his favor, tends to show that Mr. Newnum's death did *not* arise out of the Belly Dump's use, maintenance, or entrustment to others.

Defendant has failed to meet this burden. He does present evidence that three witnesses do not know how Mr. Newnum came to be crushed. Specifically, he presents the deposition testimony of Mr. Esparza, Mr. Mares, and Ms. Peskor to the effect that they did not see Mr. Newnum being injured.[32] (Doc. 54 at 5 (citing Doc. 54-1 at 9, 12; Doc. 54-2 at 5; Doc. 54-4 at 4).) But, even viewed in Defendant's favor, these witnesses' claimed lack of knowledge about how Mr. Newnum died does not logically controvert Defendant's specific, affirmative allegations on this point. In other words, Defendant's attempt to rebut his own admissions that the Belly Dump gates crushed and fatally injured Mr. Newnum with testimony professing ignorance about whether they did so fails as a matter of law.

Defendant also relies on Sergeant Tucker's speculation about how Mr. Newnum died to try to contradict his prior admissions. Specifically, Defendant cites to Sergeant Tucker's testimony—unsupported by any personal knowledge or identified expertise—that he believed Mr.

---

[32] In his wrongful death complaint, Defendant does not attribute his alleged knowledge of how Mr. Newnum was crushed to Mr. Esparza, Mr. Mares, or Ms. Peskor. (*See generally* Doc. 1-2.) Also, the Court notes that these three witnesses are not the only possible sources of information about the cause of Mr. Newnum's injuries. For example, Mr. Newnum was conscious and able to speak after he fell to the ground and so could have told others how he was crushed before he died several days later. (*See* Doc. 54-2 at 6.)

Newnum could not have been crushed *between* the Belly Dump gates. (Doc. 54 at 5 (citing Doc. 54-3 at 3).) However, as discussed in Section II.B., *supra*, Sergeant Tucker further testified to his belief that Mr. Newnum was crushed *beneath* the Belly Dump gates. (Doc. 54-3 at 4.) And as a matter of law, Mr. Newnum's death would arise out of the Belly Dump's use, maintenance, or entrustment to others whether he was crushed beneath its gates or between them. Thus, even if Sergeant Tucker's speculation about how Mr. Newnum died were cognizable evidence, it would not create a genuine factual dispute regarding whether the auto exclusion applies.

Finally, it is worth noting that, notwithstanding his present position that he does not know exactly how Mr. Newnum died, Defendant admits that the Belly Dump was "somehow" involved. (Doc. 54 at 11-13.) Indeed, he could not plausibly do otherwise, because he has presented no evidence or argument that any other instrumentality present at the scene and capable of inflicting fatal crush injuries had any causal connection to the accident.[33] In this regard, the Court notes that Defendant wholly fails to explain how Mr. Esparza's "dangerous behavior" vis-à-vis Mr. Newnum could have caused Mr. Newnum's fatal crush injuries independently of the Belly Dump. (Doc. 54 at 12-13.) Thus, the auto exclusion would preclude coverage even if the Court were to apply the test Defendant draws from *Taylor*, *i.e.*, that for the auto exclusion to apply, there must be "no independent non-auto-related act" that caused the claimed loss. (*Id.* at 11); *see Taylor*, 925 P.2d at 1283.

In sum, in the underlying wrongful death action, Defendant alleged that Mr. Newnum sustained the injuries that caused his death when the Belly Dump gates crushed him, and these

---

[33] Viewing the record evidence in Defendant's favor, the only other instrumentalities present at the scene and capable of inflicting fatal crush injuries were the truck Mr. Mares used to tow the Belly Dump, the vehicles Mr. Esparza and Ms. Peskor drove to the clean-out pile, and possibly another belly dump truck-and-trailer owned by Russ and/or Max Armenta. (Doc. 54-1 at 6-7, 9, 13; Doc. 54-2 at 2, 4, 12.) But Defendant has not presented any evidence or argument to suggest that one or more of these other vehicles were even tangentially involved in Mr. Newnum's death.

affirmative, unequivocal allegations are admissible evidentiary admissions under Rule 801(d)(2), because he has taken a contrary position in the case at bar. Yet, Defendant has presented no cognizable evidence that rebuts his prior admissions. Nor has he presented any evidence to dispute that, at the time of the accident, Mr. Esparza owned the Belly Dump but had loaned it to Mr. Mares; Mr. Mares was using it to deliver paving material; and, Mr. Mares asked Mr. Newnum to help clean its gates. In these circumstances, there is no genuine factual dispute regarding whether Mr. Newnum's death arose out of the use, maintenance, or entrustment to others of an auto owned by an insured; and, as a matter of law, the auto exclusion in the liability portion of the Policy's CGL Component applies to exclude coverage. Plaintiff is therefore entitled to a summary judgment declaring that it has no duty to indemnify Mr. Esparza or OE under this portion of the Policy for Defendant's claims in the wrongful death action.

4. **The medical payments portion of the CGL Component provides no coverage because it incorporates the auto exclusion in the liability portion of the CGL Component.**

Plaintiff next seeks a summary judgment declaring that the medical payments portion of the Policy's CGL Component provides no coverage for Mr. Newnum's fatal injuries because this portion of the Policy incorporates the auto exclusion in the liability portion of the CGL Component, and also excludes coverage for expenses incurred as a result of bodily injury to a "[h]ired [p]erson." (Doc. 52 at 21 (citing Doc. 1-1 at 12).)

Defendant does not dispute that the medical payments portion of the CGL Component incorporates the exclusions in the liability portion of that component, including the auto exclusion discussed in Section II.C.3, *supra*. (*See generally* Doc. 54.) And as explained in that section, the auto exclusion excludes liability coverage for Defendant's wrongful death claims as a matter of law, because there is no genuine factual dispute regarding whether Mr. Newnum's death arose out

of the use, maintenance, or entrustment to others of an insured's auto. Thus, the auto exclusion operates to preclude coverage under the medical payments portion of the CGL component as well. *Cf. Rummel v. St. Paul Surplus Lines Ins. Co.*, 1997-NMSC-042, ¶¶ 12, 16, 945 P.2d 985, 989-90 ("*Rummel II*") (holding that exclusion not expressly stated in policy but incorporated by reference to another policy in a "multi-layer insurance package[]" is enforceable provided reference is "sufficiently clear" to bring exclusion to average insured's attention). Plaintiff is entitled to a summary judgment declaring that it has no duty to indemnify Defendant, Mr. Esparza, or OE under the medical payments portion of the Policy's CGL component for any expenses incurred as a result of Mr. Newnum's fatal injuries.[34]

### 5.  The Policy provides no coverage for punitive or exemplary damages.

Finally, Plaintiff seeks a summary judgment declaring that the Policy provides no coverage for punitive or exemplary damages. (Doc. 52 at 21-22.) In support, Plaintiff submits an endorsement applicable to both the Auto and CGL Components of the Policy which states that "[t]his insurance does not apply to liability for punitive or exemplary damages." (*Id.* (citing Doc. 1-1 at 13).) Defendant does not address this argument in his response to Plaintiff's Motion. (*See generally* Doc. 54.)

As discussed in Section II.C.2, *supra*, the failure to respond to an argument raised in a motion constitutes consent to grant the motion as to that argument. *Lewis*, 542 F. Supp. 3d at 1168 n.6. Thus, Defendant's failure to respond to Plaintiff's argument that the Policy provides no coverage for punitive or exemplary damages constitutes consent to grant Plaintiff's Motion as to that argument.

Further, under New Mexico law, an insurance policy "may exclude coverage of punitive

---

[34] Because the auto exclusion excludes coverage under the medical payments portion of the CGL Component, the Court need not decide whether the hired-person exclusion in that portion would also preclude coverage.

damages in any manner which would bring the exclusion to the attention of the average insured." *Rummel II*, 1997-NMSC-042, ¶ 11, 945 P.2d at 989. And here, Plaintiff has presented undisputed evidence that a Policy endorsement expressly excludes coverage for liability for punitive or exemplary damages. (Doc. 1-1 at 13.) Plaintiff is therefore entitled to a summary judgment declaring that it has no duty to indemnify OE or Mr. Esparza under the Policy for punitive or exemplary damages arising out of Defendant's wrongful death claims.

## III.  Conclusion

For all of the above reasons, Plaintiff's Motion for Summary Judgment on its Complaint for Declaratory Judgment Relief (Doc. 52) is GRANTED. As a matter of law, the Court DECLARES that Plaintiff has no duty under the Policy to indemnify Mr. Esparza, OE, or Defendant for any liability arising out of the claims Defendant brought in *Szantho v. OE Trucking*, D-101-CV-2021-01136 (1st Jud. Dist. Ct., N.M.), or for any expenses incurred as a result of Mr. Newnum's fatal injuries.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent